COMMONWEALTH vs. JOHN W. DONOGHUE.

Hampden.    November 8, 1976. — December 31, 1976.

Present: HALE, C.J., GRANT, & BROWN, JJ.

*Narcotic Drugs.   Due Process of Law,* Vagueness of statute.   *Words,*
    "Chronic."

G. L. c. 94, § 210A, which required every physician treating persons
    suffering from the chronic use of narcotic drugs to furnish the De-
    partment of Public Health with certain information within seventy-
    two hours of the first treatment of such a person, and carried crimi-
    nal penalties for those who failed to comply with its terms, was
    unconstitutionally vague with respect to the term "chronic use."
    [755-757]

COMPLAINTS received and sworn to in the District Court
of Springfield on August 27, 1971.

Upon appeal to the Superior Court, the cases were tried
before *Barry,* J., a District Court judge sitting under stat-
utory authority.

*Efrem A. Gordon* for the defendant.
*Daniel E. O'Malley,* Special Assistant District Attorney,
for the Commonwealth.

BROWN, J.    The defendant appealed to the Superior
Court from District Court convictions on complaints charg-
ing him with violations of G. L. c. 94, §§ 200 and 210A (as
in effect prior to their repeal by St. 1971, c. 1071, § 2).[1]
On November 30, 1973, the jury returned a verdict of not
guilty on the complaint alleging violation of G. L. c. 94,
§ 200, and verdicts of guilty on numerous complaints alleg-

_____

[1] At all times material to the controversy, these sections of the statute
were in effect, but repeal occurred and was effective before the trial in
the District Court. All subsequent references will be to the versions in
effect prior to repeal in 1971.

ing violations of G. L. c. 94, § 210A.[2] The defendant is here on his exceptions to the denials of his motions to dismiss, filed pre-trial and renewed at the close of all the evidence, and to the denials of his motions for directed verdicts.

On or about August 6, 1971, police officers of the city of Springfield observed the defendant's patients purchasing methadone in local drug stores under prescriptions issued by the defendant. Thereafter, a search of the records of the Department of Public Health in Boston failed to disclose the names of the patients treated by the defendant or any of the other data required to be submitted by physicians treating patients "suffering from the chronic use of narcotic drugs." G. L. c. 94, § 210A. A search warrant was obtained, and, pursuant to the warrant, the defendant's office was entered on August 26, 1971. The defendant was placed under arrest, and approximately 1,000 copies of prescriptions were seized, together with the defendant's ledger books, diaries, and other records of patients receiving psychiatric treatment, including their names, addresses, dates of treatment, and diagnostic data.

At the trial several witnesses presented by the Commonwealth testified as to how long they had been narcotics users and as to the treatment given them by the defendant. Numerous other witnesses, also called by the Commonwealth, testified as to their respective opinions of what constituted "chronic use" for the purposes of G. L. c. 94, § 210A. Summaries of the testimony of some of these witnesses will be presented in greater detail later in the opinion.

---

[2] General Laws c. 94, § 210A, as appearing in St. 1957, c. 660, § 1 stated: "Every physician and every hospital treating persons suffering from the *chronic use* of narcotic drugs shall within seventy-two hours of the first treatment therefor furnish the department of public health with a statement in duplicate containing the name, address, height, weight, date of birth, color of eyes, color of hair, the date treated, and the name of the narcotic drug the patient used or suffered from. Such information shall be made available for the use of any agency of the commonwealth or of the United States which may require it" (emphasis supplied). Compare the current statute, G. L. c. 94C, § 24 (inserted by St. 1971, c. 1071, § 1).

The defendant's first contention is that the statute under which the complaints were issued, G. L. c. 94, § 210A, was unconstitutionally vague and indefinite and that his convictions thereunder constitute denials of due process of law.[3] Because G. L. c. 94, § 210A, carried criminal penalties for those who failed to comply with its terms (G. L. c. 94, § 217 [as in effect prior to its repeal by St. 1971, c. 1071, § 2]), it must be regarded as a penal statute for the purpose of determining whether the language employed was definite enough.

Due process requires that the terms of a penal statute, particularly one creating a new offense, "must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties . . . . And a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Connally* v. *General Constr. Co.* 269 U. S. 385, 391 (1926). *Lanzetta* v. *New Jersey,* 306 U. S. 451, 453 (1939). *Smith* v. *Goguen,* 415 U. S. 566, 572-574 (1974). *Commonwealth* v. *Slome,* 321 Mass. 713, 715-716 (1947). *Commonwealth* v. *Carpenter,* 325 Mass. 519, 521 (1950). *Alegata* v. *Commonwealth,* 353 Mass. 287, 293 (1967). *Commonwealth* v. *Jarrett,* 359 Mass. 491, 496-497 (1971). See *Grayned* v. *Rockford,* 408 U. S. 104, 108, and cases in n.3 (1972).[4] See generally, Note, The Void-

---

[3] We are not confronted with a situation where the statutory language in question has received prior judicial construction. In such circumstances, it would be more difficult for the defendant to press his vagueness claim. See *Winters* v. *New York,* 333 U. S. 507, 510 (1948); *Commonwealth* v. *Balthazar,* 366 Mass. 298, 300 (1974); *Commonwealth* v. *A Juvenile,* 368 Mass. 580, 585-586, 596-597 (1975); Note, The Void-For-Vagueness Doctrine in the Supreme Court, 109 U. Pa. L. Rev. 67, 68, n.4 (1960).

[4] *Grayned* also stands for the proposition that vague laws also suffer from the constitutional vice of being subject to arbitrary and discriminatory enforcement. A law that fails to provide explicit standards for those charged with enforcing it permits the police, judges and juries to apply subjective standards in determining who has violated it. 408 U. S. at 108-109.

For-Vagueness Doctrine in the Supreme Court, 109 U. Pa. L. Rev. 67 (1960).

The statute that the defendant was convicted of violating, G. L. c. 94, § 210A, required every physician to report to the Department of Public Health the name, address, description, and other data concerning every person he treated who was "suffering from the chronic use of narcotic drugs." "Chronic" is defined in medical dictionaries as "[c]ontinued over a long period of time, usually in a mild form" and as the opposite of acute. E.g., Schmidt, Attorneys' Dictionary of Medicine (1976); Maloy, Medical Dictionary for Lawyers (2d ed. 1951). "Chronic diseases" have been defined variously in court decisions as being of long duration and unyielding to treatment (e.g., *Swann* v. *National Union Ben. Assn.* 357 Ill. 78, 80-81 [1934]; *Williams* v. *Southern Sur. Co.* 211 Mich. 444, 452 [1920]; *Stegall* v. *St. Joseph Lead Co.* 465 S.W. 2d 855, 860-861 [Mo. App. 1971]; *Messer* v. *Beighley,* 409 Pa. 551, 554 [1963]), and as being constant and continuing and characterized by progressive symptoms (e.g., *Woodward & Co.* v. *State Industrial Commn.* 349 P. 2d 638, 640 [Okla. 1960]), as opposed to "acute diseases" (e.g., *Jones* v. *Yarborough,* 2 Ala. 524, 525 [1841]).

None of the witnesses who testified at the trial could agree on any one definition of "chronic." Inspector N. Cornelius of the food and drug division of the Department of Public Health, called by the Commonwealth, testified that he believed "chronic meant long term or a long period" and that he had heard it defined "as meaning permanent or incurable." He also testified "that if a person used heroin for six months or a year on a daily basis, he would call that person a chronic user but that if that person stopped using heroin, he would be neither a chronic user nor a user." Police Sergeant Kulig, who participated in the investigation that led to the defendant's arrest, testified that "he had made a conclusion as to chronic use based upon the quantity or the frequency of the prescriptions seized." The Commonwealth called Sister Caroline Smith, a program coordinator of the methadone mainte-

nance treatment program at Providence Hospital, in Holyoke, Massachusetts. She testified that it was her understanding that a person who had been using "say, hard drugs for approximately two years ... would be ... a chronic user, perhaps." Dr. John J. Driscoll, called by the Commonwealth, a physician in general medicine and surgery at Providence Hospital and the director of its methadone clinic, when asked to define "a chronic use of drugs," replied: "Fifteen bags of heroin on a daily basis is a chronic use of drugs, also one bag of heroin each day for two years is a chronic use." He also testified "that acute and addiction refer to two different things; that an addict is a person in chronic use." Marilyn Karczynski, a defense witness and an attorney for the Department of Public Health,[5] testified that "there was no legal definition published by the Department of Public Health available for the guidance of those seeking to determine its meaning." As can be observed from the testimony of the Commonwealth's own witnesses, there are quite a few different definitions of the term "chronic." This fact alone would make application of the term "chronic" in the context of this statute most difficult, if not impossible.[6]

Moreover, the definitions of "chronic" provide so much latitude that it could have been expected that the statute would be applied differently by different practitioners.[7] For example, if "chronic" use is use over a "long" period of time, how should "long" be defined? If "chronic" is defined as "frequent" use, what is the proper interpretation of "frequent"?

---

[5] Attorney Karczynski indicated she also had official administrative duties which included a public information function.

[6] The following appears in the brief for the Commonwealth: "After lengthy testimony by expert witnesses both at pre-trial hearings and at trial, it seems clear that the only point all parties could agree on was that it was very difficult to assign a specific definition to the term 'chronic.' "

[7] See Vigoda, Tracking the Reporting Statutes, 10 Newsletter of the Massachusetts Medical Society 5-6 (July, 1970). (Mr. Vigoda was an Assistant Attorney General for the Commonwealth of Massachusetts.)

In *McMurtry* v. *State Bd. of Medical Examrs.*, 180 Cal. App. 2d 760 (1960), a similar statutory scheme employing the language "habitual user" was found to be unconstitutionally vague because the statute provided no criterion by which a physician could determine how many instances of narcotics use must take place before a person becomes an "habitual user." *Id.* at 770. The phrase "chronic use" poses problems in application similar to those posed by the phrase "habitual user." A physician must, of necessity, guess at its meaning and application. See *Weissman* v. *United States*, 373 F. 2d 799, 800-801 (9th Cir. 1967), citing *McMurtry* with approval. We therefore conclude that the statute did not comport with the requirements of due process of law.

The defendant's motions for directed verdicts on the complaints charging him with violations of G. L. c. 94, § 210A, should have been granted, and his exceptions are therefore sustained. Judgments are to be entered for the defendant.[8]

*So ordered.*

---

[8] Our disposition of these cases makes it unnecessary for us to consider any of the defendant's other contentions.